**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

DARIA PASTOUKHOVA GOGOLEVA,
Individually and as the natural parent and
Legal Guardian of the minor children
A.A.P.V., N.M.P.V., and  L.P.V., and as the
Personal Representative of the ESTATE OF
LANCE VALDEZ,

      Plaintiffs,

vs.

STEVEN MARKS, individually, and
PODHURST ORSECK, P.A., a Professional
Association,

      Defendants.

CASE NO.: 1:14 cv-24274

## COMPLAINT FOR DAMAGES

Plaintiffs, Daria Pastoukhova Gogoleva (sometimes hereinafter referred to as "Daria" or "Ms. Pastoukhova"), individually, and as the parent and natural guardian of Lance Valdez's and Ms. Pastoukhova's three minor children, A.A.P.V., N.M.P.V., and L.P.V. (sometimes collectively referred to as the "Minor Children"), and as the Personal Representative of the Estate of Lance Valdez (sometimes referred to herein as the "Valdez Estate"),  by and through their attorneys, bring this action seeking damages against Defendants Steven C. Marks and Podhurst Orseck, P.A., (sometimes collectively referred to as the "Defendants"), as follows:

## PARTIES, JURISDICTION AND VENUE

1.      This is a diversity action for damages.

2.      Plaintiff Ms. Pastoukhova, individually and as the parent and natural guardian of the Minor Children and as the Personal Representative of the Valdez Estate, is over the age of majority, resides in Lyford Cay, Nassau, Bahamas, is a permanent resident of the Bahamas, is a citizen of Spain, and is otherwise *sui juris*.  Ms. Pastoukhova was married to Lance Valdez in 2005, and remained married to him through the time of his death in November, 2012.

3.      Plaintiff A.A.P.V. is 10 years of age, is the minor child of Daria Pastoukhova and Lance Valdez and resides with her mother, Daria Pastoukhova, in the Bahamas.

4.      Plaintiff N.M.P.V. is 8 years of age, is the minor child of Daria Pastoukhova and Lance Valdez and resides with her mother, Daria Pastoukhova, in the Bahamas.

5.      Plaintiff L.P.V. is 3 years of age, is the minor child of Daria Pastoukhova and Lance Valdez and resides with his mother, Daria Pastoukhova, in the Bahamas.

6.      Defendant Steven C. Marks (hereinafter sometimes referred to as "Marks") is a partner with the law firm of Podhurst Orseck, P.A (hereinafter sometimes referred to as the "Podhurst Firm").  Upon information and belief, Marks is a resident of Miami-Dade County, Florida.  Marks is over the age of majority and is otherwise *sui juris*.

7.      Defendant, the Podhurst Firm, is a well-known law firm operating as a Professional Association and created under the laws of Florida. Podhurst Orseck, P.A.'s only office is located at 25 West Flagler Street, Suite 800, Miami, Florida 33130, and is within Miami-Dade County, Florida.

8.      Ms. Pastoukhova had no prior relationship with Steven C. Marks or the Podhurst Firm.

9.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332(a). Jurisdiction is founded upon diversity of citizenship, 28 U.S.C. §1332, in that: (a) at all

times material to these causes of action, Plaintiffs were residents of Nassau, Bahamas; (b) at all times material to these causes of action, Defendant Marks was and continues to be a resident of Miami-Dade County, Florida; and Defendant, the Podhurst Firm, is a professional association operating under the laws of Florida, with a business address of 25 West Flagler Street, Suite 800, Miami, Florida, 33130; and (c) the amount in controversy exceeds the minimum amount of $75,000.000, exclusive of costs and interests.

10.     This Court has personal jurisdiction over the Defendants, and venue is proper in this District under 28 U.S.C. §1391. Defendant Steven C. Marks is a resident of Miami-Dade County, and defendant Podhurst Firm Podhurst Orseck, P.A. has a business address of 25 West Flagler Street, Suite 800, Miami, Florida 33130.

## SUMMARY AND OVERVIEW OF THIS ACTION

11.     This is an action seeking, among other things, damages for legal malpractice, breach of fiduciary duty, fraudulent misrepresentation, negligent and intentional misrepresentation, fraudulent inducement, conspiracy in the foregoing connection, and breach of contract by Defendants, Marks and the Podhurst Firm, with the ultimate purpose of that conduct and course of action being to induce Daria Pastoukhova to retain Defendants, Marks and the Podhurst Firm as the attorneys for Plaintiffs, and have them convince her to sign a General Release, releasing Jeffrey Soffer, owner of Turnberry Associates, the Fontainebleau Hotel, Fontainebleau Aviation and Turnberry Media, (sometimes hereinafter referred to as "Soffer"), and Paula and Daniel Riordan (husband – who is President of Residential Development at Turnberry Associates – and wife) (sometimes herein referred to as the  "Riordans"), and one or more others from any and all liability in connection with the helicopter crash that killed Lance Valdez  (the "Release").

## FACTS COMMON TO ALL COUNTS

3

A. <u>**Overview of the Purpose and Composition of Defendants' Conspiracy**</u>

12.     On Thanksgiving Day, November 22, 2012, an Aerospatiale Twin Star helicopter (sometimes hereinafter referred to as the "Helicopter") crashed at Baker's Bay Golf and Ocean Club on Great Guana Cay, in the Abacos Island, Bahamas (hereinafter sometimes referred to as "Baker's Bay"), killing Lance Valdez (which crash and the attendant circumstances is and are sometimes hereinafter referred to as the "Helicopter Crash" or the "Crash").

13.     Lance Valdez was a highly successful international tax and business lawyer, with a Masters in Tax Law (LLM) from New York University Law School, and the principal of an international tax management company.

14.     At the time of the Crash, the Helicopter was being piloted by Jeffrey Soffer.

15.     On board the Helicopter at the time of the Crash, in addition to Soffer, were Lance Valdez, the Riordans, and David Pearce ("Pearce").

16.     Pearce is a duly licensed helicopter pilot who was also the regular pilot of the Helicopter involved in the Crash.

17.     Upon information and belief, although Soffer represented to Lance Valdez on one or more occasions that he was a licensed helicopter pilot, and was experienced in flying helicopters similar to the Aerospatiale Twin Star Helicopter, in fact, on the date and at the time of the Helicopter Crash, Soffer was not a licensed helicopter pilot, and, upon information and belief, was not otherwise sufficiently experienced to fly the Aerospatiale Twin Star Helicopter safely.

18.     From and after the Helicopter Crash, Soffer, including with the assistance of one or more third parties, falsely claimed that he was not flying or piloting the Helicopter at the time of the Crash, and has asserted instead that Pearce was piloting and in control of the Helicopter at the time of the Crash.

4

19.     Within only a day or so following the Crash, and proximately upon his return to Miami from the Bahamas, and despite the fact that he was purportedly severely injured and incapacitated, Soffer, with great energy and alacrity and to serve and protect his own interests, sought to have one or more third parties act at his behest, and had them contact Marks and the Podhurst Firm and communicate  to them Soffer's  false version of the facts and circumstances pertaining to the Crash, and to have them thereafter promptly fly down to the Bahamas to, in turn, importune Daria Pastoukhova to retain Marks and the Podhurst Firm to represent her, the Minor Children and the Valdez Estate.

20.     Upon information and belief, this was initiated by Soffer calling Craig Robbins, the boyfriend and/or paramour of his sister, Jackie Soffer, co-owner of Turnberry Associates. Robbins is a prominent and successful Miami based real estate developer and friend of Aaron Podhurst and Marks of the Podhurst Firm. Through Robbins, Soffer persuaded Marks to immediately fly down to the Bahamas for the express purpose of meeting with Daria Pastoukhova and the family and advisors of Lance Valdez, in an attempt to induce Daria Pastoukhova to immediately retain the firm before she might involve any other lawyers or advisors in this matter.

21.     Defendant Marks, together with Soffer, the Riordans, and Alex Krys, (formally President of Turnberry Associates and sometimes hereinafter referred to as "Krys"), thereafter all conspired, directly or indirectly, and in various ways, to induce Daria to retain Defendants Marks and the Podhurst Firm to execute a "Retainer for legal services", and to provide legal representation in pursuance of that Retainer, as described herein.

22.     With respect to the claims for fraudulent inducement and civil conspiracy to induce the execution of the Release, it is alleged that Soffer, together with the Riordans,  Krys, Defendants Marks and the Podhurst Firm, and one or more others, conspired and otherwise acted

in a way that was intended to conceal from Ms. Pastoukhova, and others acting on her behalf, the fact that Soffer, not Pearce, was flying the Helicopter at the time of the Helicopter Crash, and that Soffer's negligence was primarily, if not solely, responsible for the death of Lance Valdez.

23.     It was a key element and intent of the underlying conspiracy to focus the Plaintiffs' attention on pursuing and obtaining the recovery of certain insurance proceeds, rather than to pursue an investigation of the facts relating to the Crash and the wrongful death of Lance Valdez, and to induce Plaintiffs to refrain from pursuing other actions and/or claims against any person(s) who might have been responsible and liable in any manner for the death of Lance Valdez--for the ultimate purpose of encouraging and inducing Daria Pastoukhova to issue a full and general release in favor of Soffer, the Riordans and others from liability for, or with respect to, the death of Lance Valdez (the "Conspiracy").

24.     As further detailed below, Defendants Marks and the Podhurst Firm were aware, or should have been aware, that it was, and/or might likely have been Soffer, not Pearce, who was piloting the Helicopter at the time of the Crash, and/or each of such Defendants had a good and a reasonable basis to have made an energetic and due diligence investigation of those facts, but they failed to do so.

25.     Upon information and belief, this subterfuge, deception, and the resulting Conspiracy was necessary because if it was discovered that Soffer was piloting the Helicopter without a valid license, he would be personally liable and responsible to the Plaintiffs for the death of Lance Valdez—most likely without any insurance coverage being available to pay such personal liabilities.

**B. <u>Facts Related to the Helicopter Crash</u>**

26.     On November 22, 2012, Thanksgiving Day, Pearce piloted and flew the Helicopter to the airport in Marsh Harbor, the Bahamas, to pick up Lance Valdez's longtime friend, Jeffrey Soffer and the Riordans.

27.     Lance Valdez accompanied Pearce on the flight to the Marsh Harbor airport.

28.     The Aerospatiale Twin Star experienced no mechanical problems or other issues on the journey to the Marsh Harbor airport.

29.     Soffer requested that Lance Valdez permit him to fly the Helicopter from Marsh Harbor to Bakers Bay, instead of Pearce, the regular Pilot of the Helicopter at that time.

30.     Thereafter, Soffer piloted the Helicopter on that day's flight to Bakers Bay.

31.     Access to Bakers Bay can only be gained by helicopter, or by boat.

32.     At the time of the planned departure from Marsh Harbor on November, 22, 2012, Pearce believed that Soffer was a licensed and experienced helicopter pilot, including as to helicopters similar, or substantially similar to the Aerospatiale Twin Star Helicopter.

33.     Upon information and belief, this perception and belief was derived from the fact that Soffer advised Lance Valdez on one or more occasions that he was a licensed helicopter pilot, and that he flew and piloted helicopters substantially similar to the Aerospatiale Twin Star Helicopter, and, in turn, Lance Valdez so informed Pearce.

34.     In fact, public records reflect that Soffer holds a Federal Aviation Authority ("FAA") pilot certificate; and FAA records for Soffer indicate that he is a licensed pilot for airplanes, single engine and multi-engine land and instruments; and he has type ratings in three corporate jet Models: Global Express BBD-700, Cessna Citation CE-500, and Challenger CL-604.

35.    However, FAA records reflect that Soffer did not, on the date of the Crash, have a current helicopter license, certificate or rating.

36.    The Aerospatiale Twin Star has dual controls which allow either the pilot or co-pilot to fly the aircraft.

37.    During the flight to Bakers Bay, Soffer sat in the co-pilot seat and piloted the Aerospatiale Twin Star at all times from the airport in Marsh Harbor, Bahamas, until the time and occurrence of the Helicopter Crash at Baker's Bay.

38.    Upon information and belief, Soffer owns property and a residence at Bakers Bay.

39.    There is a clearing near Baker's Bay, which, upon information and belief was known as the "Helicopter Landing Area", but which was not officially designated as a helicopter landing site, but which nonetheless was unofficially used by workers at Bakers Bay to land helicopters, provided that each helicopter announced to Bakers Bay employees that the Helicopter was approaching.

40.    It was at this clearing that Soffer attempted to land the Helicopter.

41.    Pearce had not previously flown into Bakers Bay and was not familiar with and did not know about the particular clearing where Soffer chose to land the Aerospatiale Twin Star.

42.    Upon information and belief, as an experienced helicopter pilot with more than 8,400 hours of flying time, 5,400 hours of which were expended in flying helicopters, Pearce would not have attempted to land at this site without first doing a "360 Degree Reconnaissance" of the landing site from a high vantage point, so as to be able to first assess all variables and landing conditions, including any wind shear or other conditions.

43.    Upon information and belief, due to his lack of experience in piloting the Aerospatiale Twin Star, Soffer approached the landing site too quickly, ultimately taking a low and direct path that would not be typical for an experienced helicopter pilot.

44.     The approach path taken by Soffer in anticipation of landing the Helicopter at the Bakers Bay landing site took the Helicopter directly over the Bakers Bay Challenge Course, which, upon information and belief, was an unusual approach for helicopters seeking to land at that helipad location.

45.     Upon information and belief, flights over the Bakers Bay Golf Course would not ordinarily be countenanced by Bakers Bay's management due to the disruption of the quietude of golf play at that course.

46.     As the Helicopter approached the Bakers Bay landing site, and as it was nearing the ground for a landing and was approximately ten (10) to fifteen (15) feet off the ground, the Helicopter was subjected to appreciable wind turbulence, which condition was compounded by Soffer's inexperience in flying the Helicopter, and the combination of these conditions and circumstances caused the Helicopter to crash.

47.     It was primarily due to Soffer's inexperience in piloting the Aerospatiale Twin Star that he pulled back too sharply on the controls in response to the wind turbulence, causing the Helicopter to rear backwards some 75 feet, spin out of control and crash violently into the ground at approximately 1:00 p.m. on November 22, 2012, breaking the tail and tail rotor assembly, killing Lance Valdez and injuring each of Soffer, the Riordans and Pearce.

48.     At the time of the Helicopter Crash, Lance Valdez was seated in the left rear seat of the Helicopter, Paula Riordan was seated in the middle back seat and Daniel Riordan was seated in the right rear seat.

**C.  Aftermath of the Helicopter Crash;  Circumstances Indicating Soffer Was Flying**

49.     Upon information and belief, the first person to arrive at the site of the Helicopter Crash was Mark Gerard Hussey, Senior Food and Beverage Director at Bakers Bay; who having been advised about and then observing that the Helicopter had crashed, and was lying upside

9

down and in pieces on the ground, immediately called on his radio for Nathan Tai Andrews, Director of Security at Bakers Bay, and Bonnie Wright, a nurse at Bakers Bay to come to the Crash site.

50.     After arriving at the Helicopter Crash site, Nathan Andrews attended to Lance Valdez, who appeared lifeless, and administered CPR in an effort to revive him.

51.     While Lance Valdez's limp and lifeless body was lying prostrate on the ground at the Crash site, Jeffery Soffer took actions to enable him and the Riordans to flee the Crash site by boat, and to thereby extricate himself and the Riordans from the Bahamas to Miami, putatively to seek emergency medical attention in Miami, while not making any effort to similarly evacuate Pearce, who, upon information and belief, was suffering from equally grave injuries.

52.     Upon information and belief, the pressing motivation for the urgency of this removal to Miami was to allow Soffer and the Riordans to avoid having to answer any questions concerning the Helicopter Crash, which might be posed by Bahamas Police who were expected to imminently arrive at the Crash site.

53.     Upon information and belief, among Soffer's concerns with respect to avoiding questioning in connection with the Helicopter Crash was his fear that: (i) it would be discovered that he was flying the Helicopter at the time of the Helicopter Crash; (ii) he either did not have a valid helicopter pilot's license; (iii) any such license was revoked due to one or more other prior aviation mishaps or accidents; and/or (iv) any license he had, expired without renewal, and in all events was invalid for any  insurance purposes.

54.     It is believed that Soffer was filled with trepidation because if it was learned that he was operating the Helicopter at the time of the Helicopter Crash without a valid license he would be found liable for Lance's death.

55.     The day following the Helicopter Crash, on November 23, 2012, Daria, Lance Valdez's brother Frank Valdez (sometimes hereinafter referred to as "Frank"), Lance's other and younger brother Omar Valdez (sometimes hereinafter referred to as "Omar"), and a close family friend, Jamie Dingman, traveled to Doctors Hospital to view Lance's body--then situated in the public morgue, located next door to Doctors Hospital.

56.     While there, Daria, Frank, Omar and Jamie Dingman also visited with Pearce in his hospital room.

57.     When Daria, Frank, Omar and Jamie Dingman arrived at Pearce's hospital room, and upon their inquiry, Pearce told members of the family that he was not flying the Helicopter at the time of the Crash, but, rather, stated that Soffer had piloted the Helicopter for the entirety of the flight from Marsh Harbor to the Crash site at Bakers Bay, and specifically, was in full control of the Helicopter at the time of the Helicopter Crash.

**D.  Unseemly Importunities to Retain Defendants; Implementation of the Conspiracy.**

58.     Soffer's first conversation with Daria following the Helicopter Crash was by telephone on the first Monday after the Helicopter Crash, i.e., on or about November 26, 2012.

59.     In that conversation, Soffer told Daria that prior to the attempted landing, the pilot, Pearce, lost control of the Helicopter and they crashed.

60.     Purportedly, due to his resulting physical injuries and condition Soffer did not attend the funeral for his good friend, Lance Valdez, which was held in the Bahamas on Saturday, December 1, 2012.

61.     Since he could not attend Lance's funeral, he told Daria that he would fly Krys and a coterie of others, who were friends of Lance Valdez, on his private jet to attend the funeral service in the Bahamas on December 1, 2012.

62.     Only days after the Helicopter Crash, Krys, the President of Turnberry, and a person who was thus a subordinate to Soffer in his business activities, and, upon information and belief, otherwise a confidante and friend of Soffer outside of those business activities, came to the Valdez  Residence, at Lyford Cay, Nassau, Bahamas, to speak to Frank Valdez and Daria Pastoukhova about the circumstances of the Crash, and unsolicited by them urged them to take affirmative action to protect their rights in respect of Lance Valdez's untimely death, including by promptly retaining aviation counsel recommended by Soffer and Krys.

63.     The legal counsel recommended by, and which Soffer and Krys strongly urged Plaintiffs to retain, were Defendants, Marks and the Podhurst Firm.

64.     Although Krys said to Daria Pastoukhova that he had traveled to Nassau on November 26, 2012, just to see how Daria and the Minor Children were making out after the Crash, he did not have the kind of close and personal relationship with her and/or the Minor Children that would warrant or motivate such a social excursion.

65.     In fact, in the days prior to and again during this visit to the Bahamas, Krys urged and implored Frank Valdez to induce Daria to retain legal counsel--most specifically, the Podhurst Firm and Marks.

66.     During his visit on or about November 26, 2012, Krys was speaking privately with Daria on the porch just outside the Kitchen of the Valdez Residence. In this conversation, Krys assured Daria that Pearce, not Soffer, was piloting the Helicopter at the time of the crash. To reaffirm this fact, Krys told Daria that he had spoken to Soffer several times about this, and each time Soffer confirmed that Pearce, not Soffer was piloting the Helicopter at the time of the Crash.

67.     In the course of this conversation with Daria, Frank joined them on the kitchen porch.  At that time Krys indicated that he had just assured Daria that Pearce, not Soffer, was in

control of and flying the Helicopter at the time of the Crash; and similarly confirmed to Frank Valdez that he had confirmed this with Soffer several times.

68.     In a similar vein, prior to his arrival on November 26, 2012, and only four days following the Helicopter Crash and before Lance Valdez was even buried, Krys already had engaged in one or more telephone calls in which he urged Frank to speak to Daria and have her immediately file an insurance claim against the owner of the Helicopter and its insurance carrier to cover the Valdez family's loss in respect of Lance Valdez' death.  He further stated to Daria and Frank that Soffer would pledge other of his insurance policies to Daria and the Minor Children to ease and assuage their loss of Lance Valdez.

69.     While Krys was already emphatically urging the immediate retention of the Podhurst Firm, upon information and belief, Krys had become aware that Soffer was piloting the Helicopter at the time of the Helicopter Crash, rather than Pearce.

70.      Krys urged Daria to retain the Podhurst Firm within days of the Crash, expressly so that Marks and the Podhurst Firm could gain control of the flow of information, and to focus the widowed Plaintiff's efforts on an insurance recovery, rather than an investigation of whether Soffer was flying and should be sued, and for the overall purposes of promoting and advancing the Conspiracy.

71.     At a minimum, these importunities being made so soon after the Crash, and while the Valdez family was still grieving, appeared untoward and insensitive, if not pointing to a then unperceived ulterior motive--having been launched even before Lance's burial, especially as Krys was neither a family member, a close family friend, nor a business confidante or friend of Lance Valdez.

72.     Upon information and belief, these extraordinary and unseemly overtures were made at Soffer's request and were a function of Soffer's great fear and trepidation that it would

be learned that he, not Pearce, was piloting the Helicopter at the time of the Crash, and he would be subjected to very great prospective and uninsured personal liability.

73.     Krys told Daria and Frank several times that Pearce was flying the Helicopter, at a time when, upon information and belief, he knew that this was not true, and/or at a time when he had a reasonable basis to know or believe it was not true .

74.     In addition, and in a further attempt to discredit anything that Pearce may have told Daria in regard to the fact that Soffer was flying the Helicopter at the time of the Crash, Krys also told Daria that Pearce was a drunk, and that he was untrustworthy. Upon information and belief, Krys did not have any personal knowledge in regard to Pearce, and had no reliable basis to make such a claim on or about November 26, 2012.

75.     Each time, either Soffer or Krys advised  Daria that Pearce,  not Soffer, was flying the Helicopter; they did so for the purpose of persuading Daria to pursue an insurance recovery (rather than pursue a claim against Soffer), and to ultimately obtain a release of Soffer and the Riordans from any liability.

76.     In his meetings and discussions with Frank on this November 26th trip to the Bahamas following the death of Lance Valdez, Krys continued to urge Frank to recommend to Daria that she meet with Marks and the Podhurst Firm at the earliest opportunity.  Krys told Frank that Marks was a highly regarded aviation negligence specialist and expert.

77.     Krys also stated that anytime he or one of the Soffer family-owned aviation-related businesses had an aviation issue they used the Podhurst Firm for their legal representation.

78.     In this context, Soffer and Krys were seeking to take advantage of Daria Pastoukhova based on her mistaken notion and misperception that Soffer was not flying the

Helicopter at the time of the Helicopter Crash, as that was the circumstance that had already been relayed to her by Krys and Soffer.

79.     Following the death of Lance Valdez and even prior to his burial on December 1, 2012, and while Daria Pastoukhova was still grieving inconsolably, Soffer, Marks and others followed up on Krys' urgings, directly and indirectly, including through communications with Frank Valdez, and continued to seek to induce Daria Pastoukhova to immediately retain the Podhurst Firm, which, upon information and belief, had a long and close prior relationship with Soffer's father and Soffer family-owned and controlled companies, including through Aaron Podhurst of the Podhurst Firm.

80.     These unseemly and untimely importunities by Soffer, Krys, Marks, and others, were pursued so that Soffer could orchestrate and induce Daria Pastoukhova to pursue claims to obtain any available insurance proceeds related to the Helicopter Crash, so that Soffer, though Marks and the Podhurst Firm could ultimately engineer a release in favor of himself and the Riordans, and thus avoid personal liability for crashing the Helicopter.

81.     Although Daria could not have known this, upon information and belief, Soffer and Krys understood and had the knowledge that Marks and the Podhurst Firm would be conflicted in any simultaneous and concurrent representation of Soffer, the Riordans and the Plaintiffs in the event it turned out that Soffer was flying the Helicopter at the time of the Crash.

82.     Nevertheless, Soffer and Krys pursued the goal of inducing Daria to retain Marks and the Podhurst Firm to represent everyone other than Pearce so that they could better prevent Daria from learning the truth about who was flying the Helicopter at the time of the Crash.

83.     Soffer, through Craig Robbins (believed to then be in a close and romantic relationship with Soffer's sister, Jackie), arranged to have Marks fly to the Bahamas on November 29, 2012 (only days after each of the Helicopter Crash, and Krys' preparatory trip,

and before Lance Valdez was even buried), traveling on Soffer's private jet, accompanied by a Miami-based private investigator retained by, and/or working for the Podhurst Firm (the "Investigator").

84.     The purpose of Mark's November 29, 2012 trip was to follow-up on Krys' importunities to have Daria Pastoukhova meet with Marks, so that he could implore her to promptly retain him and the Podhurst Firm to represent her interests and those of the Minor Children in connection with the death of Lance Valdez.

85.     Because Daria was still grieving, Frank Valdez introduced Jason Sweeney, a long-time advisor to Lance Valdez and his family who was not an attorney, into prior telephone discussions with Marks, including concerning Marks' desire to fly to the Bahamas to interview Pearce, and to pursue the immediate retention of the Podhurst Firm.

86.     In the ensuing discussions with Sweeney and with Frank, Marks and Krys heralded the fact that if the Valdez family retained the Podhurst Firm they would arrange with Soffer to make the proceeds of several other insurance policies maintained by Soffer, or his family-owned companies, available for the benefit of Daria and the Minor Children—so as to greatly enhance the amount of any resulting recovery.

87.     Marks did not at this time and in the course of these discussions, make any disclosure of any conflicts of interest that he and the Podhurst Firm had, or would, or could have, in respect of any retention of Defendants by Daria, including in pursuance of the Florida Bar Rules, and more specifically Florida Bar Rules 4-4.1 and 4-1.7, in light of the fact that Marks and the Podhurst Firm had already been retained by Soffer and the Riordans.

88.     In connection with his arrival in the Bahamas, and as a result of the foregoing phone call(s), Frank Valdez made arrangements for the Valdez Family driver to pick Marks up at the airport on November 29, 2012.

89.     Upon information and belief, upon their arrival the driver took Marks, accompanied by the Investigator, directly to Pearce's apartment,  as Daria was away from the residence, viewing Lance Valdez' body at the Funeral Home.

### E.  Marks Learns That The Pilot Claims That Soffer Was Flying The Helicopter

90.     Upon arrival at Pearce's apartment, the Investigator entered Pearce's apartment, without Marks, who instead went out for coffee with the Valdez Family driver.

91.     Upon information and belief, Marks knew that the Investigator was prepared to and would likely need to coerce Pearce to sign the statement, prepared by Marks while still in Florida, concerning the putative facts related to the Helicopter Crash: and Marks did not want to be a witness to such impropriety, and/or be in a position to later be a witness to what occurred in Marks' apartment.

92.      Upon information and belief,  written  facts and circumstances set out in the prepared statement were prepared based on descriptions provided by Soffer, in his self-interest; and yet Marks made no due diligence investigation to ascertain if the facts asserted by Soffer were accurate and true.

93.     When the Investigator entered Pearce's apartment he presented Pearce with the previously prepared document, deceptively entitled: "Sworn Statement," and requested that Pearce sign it.

94.     Notably, the document contemplated that it would be signed and sworn to in Miami, not the Bahamas; and it encompassed terms such as "Pilot in Command", and other language familiar which might commonly be used by attorneys specializing and/or experienced in aviation and insurance negligence practice.

17

95.     At the time that the "Sworn Statement" was presented to Pearce, he was still suffering from the substantial impairment of his vision due to injuries suffered from the Helicopter Crash.

96.     Unbeknownst to Daria at that time, after attempting to review the Sworn Statement with some difficulty, upon information and belief, Pearce adamantly refused to sign it—declaring that it was neither true, nor accurate in its statement that Pearce, rather than Soffer, was piloting and in control of the Helicopter at the time of the Helicopter Crash.

97.     Upon information and belief, upon his refusal to sign the Sworn Statement the Investigator became extremely upset and animated with Pearce; and thereafter stepped outside Pearce's apartment to call Marks on his cell phone, who, upon such contact, provided the Investigator with instructions on how to proceed with Pearce.

98.     Upon information and belief, after his brief discussion with Marks the Investigator went back into Pearce's apartment and directed Pearce to line-out those sentences in the pre-prepared Sworn Statement that he was uncomfortable with, and to thereafter sign it in his presence.

99.     However, Pearce advised the Investigator that he was uncomfortable with that process because there were "too many" inaccuracies in the Sworn Statement to simply line them out; and, ultimately, Pearce refused to sign the Sworn Statement on that occasion because it required him to confirm that he, not Soffer, was in control and in command of the Helicopter—which he continued to adamantly assert was not true.

100.    Thereafter, upon information and belief, the Investigator threatened Pearce, in substance, telling him that if he didn't sign a revision of the Sworn Statement, he would lose his pilot's license and he would never work again as a Pilot, or as an aviation mechanic. Nonetheless, Pearce remained resolute, and refused to sign the Sworn Statement at that time.

101.     Upon information and belief, by reason of these facts and circumstances as related to him by the Investigator, Marks knew on November 29, 2012 that Pearce had declared that Soffer, not he, was in control of the Helicopter at the time of the Crash.

102.     After the Investigator's meeting with Pearce concluded, the driver drove Marks and the Investigator back to the Valdez Residence where they met briefly with Sweeney.

103.     Prior to that arrival, and while then in route to the Valdez Residence, Marks called Frank  on his cell phone, and told him that the meeting with the Pilot "had not gone well", in that the Pilot "refused to sign the Sworn Statement. However Marks **did not** disclose to Frank at this time that the Pilot had emphatically declared that Soffer, not he, was flying the Helicopter at the time of the Crash.

### F.  Efforts to Coerce Pearce to Sign Sworn Statement

104.     At the same time, Marks emphasized the point to Frank that unless Pearce signed the Sworn Statement, substantially in the form presented or with some minor revisions, Daria and the Minor Children would not be entitled to receive any insurance proceeds, and they would likely get  no other compensation in connection with the death of Lance Valdez.

105.     After his arrival at the Valdez Residence, Marks and the Investigator met briefly with Jason Sweeney, during which time Marks proffered a soliloquy, describing what a great lawyer he was, and heralding the successes of the Podhurst Firm, and Marks provided Sweeney with Podhurst Firm brochures.  In this context, Marks then proclaimed that he and the Podhurst Firm were the best choice of lawyers to represent Daria and the Minor Children.  The Investigator chimed in, agreeing and supporting these statements.

106.     Marks further  reiterated his prior statement that he and the Podhurst Firm could assist Daria and the Minor Children in obtaining, through other available insurance policies

maintained by Soffer, or Soffer controlled companies, an enhanced recovery of damages in respect of Lance Valdez's death.

107.    During the time of these discussions, Sweeney and Marks were awaiting Daria's return from the funeral home, but she did not return as expected.  Accordingly, they all decided to leave the residence and meet Daria at the Wyndham Hotel.

108.    En route to meet Daria, the Valdez Family driver was instructed to drop the Investigator off at Odyssey Aviation, where Soffer's Jet was waiting to take him back to Miami; and Sweeney and Marks proceeded to meet up with Daria at the Wyndham Hotel.

109.    In the course of the meeting at the Wyndham, and even though he had just learned from his Investigator that Pearce had asserted that Soffer, not Pearce, was flying the Helicopter at the time of the Crash, Marks neither disclosed to, nor discussed this material issue of fact with Daria Pastoukhova; although he continued to importune the retention of his Firm at this meeting.

110.    Thereafter, in one or more telephone calls on November 29, 2012, Marks told Frank Valdez that he was going to have his office prepare a revised version of the Sworn Statement that would be transmitted to the Valdez Residence that same day, and Marks reiterated and emphasized to Frank that it was absolutely necessary and essential that he convince Pearce to sign the Sworn Statement  as revised, including because if he did not, Daria and the Minor Children would not be entitled to receive any insurance proceeds, and they would get nothing! Notably, Marks and the Podhurst Firm had not yet been retained; although that did not stop them from advancing the Conspiracy by having their Investigator attempt to coerce Pearce to sign the Sworn Statement.

111.    Thereafter, on  the same day, November 29, 2012, at 4:10pm Eastern Standard Time, Lydia Aja, Legal Assistant to Marks, transmitted the heralded revised version of the

Sworn Statement by e-mail to Marks, Frank, and Krys; and, in turn, Frank Valdez forwarded it to Sweeney-- asking him to print two copies.

112.     Like the earlier version, this revised form of the Statement recited that Pearce was both in control and command of the Helicopter at the time of the Helicopter Crash; and specifically utilized and encompassed the aviation term of art: "Pilot in Command", in attributing that status to Pearce.

113.     That evening, in one or more telephone calls with Frank, and following up on his prior discussions and statements made to both Daria and Frank on the kitchen porch on or about November 26, 2012, Krys separately reiterated to Frank that it would be "good for all concerned" if he could get Pearce to confirm in a written statement that Pearce, not Soffer, was in control of the Helicopter at the time of the Crash.

114.     More specifically, Krys stated that if Frank  could convince him, and if Pearce would be willing to sign such a Statement, Soffer, in turn, would be willing to make sure that Pearce would be employed by one of the Soffer-owned or controlled aviation companies, including as a mechanic.

115.      Frank was shocked that Krys was being so obvious and "up front" in his intent to induce Pearce's cooperation, and in his effort to take advantage of Pearce's fear that the adverse circumstances of the Helicopter Crash might prevent him from ever working again as a Helicopter Pilot.

116.     The next day, on November 30, 2012, Krys again called Frank, and, like Marks had the day before, again emphasized that it was critically important to get Pearce to sign the Sworn Statement, as revised.  By way of a further inducement to have Pearce execute the Sworn Statement, Krys again told Frank to advise Pearce that if he signed the Sworn Statement Soffer

"would take care of Pearce", including getting him a job working as a mechanic for one or more Soffer owned or controlled companies.

117.    In words and substance, Krys told Frank that he and Soffer would do whatever they needed to do for Pearce, but all was dependent upon Pearce cooperating and signing the revised statement.  More forcefully, like Marks had the prior day, Krys pounded home to Frank the point that Daria and the Minor Children would get nothing if Pearce didn't sign the Sworn Statement, as revised.

118.    Krys made these statements to Frank both on November 29 and 30, 2012 in furtherance of the Conspiracy, knowing that Soffer, and not Pearce, was flying the Helicopter at the time of the Crash, and, thus knowing that in seeking to induce Pearce to sign the Sworn Statement, he was seeking to induce the execution of a materially false statement, or a document which might likely be materially false.

119.    Thereafter, on November 30, 2012, following Krys' further admonitions  made earlier that day and the prior evening, Frank  presented the revised version of the Sworn Statement to Pearce for his signature—telling him what Marks and Krys had told Frank to tell Pearce, being that if he didn't sign the Statement, Daria and the Minor Children would get nothing.

120.    Upon information and belief, Pearce, who was still suffering from the substantial impairment of his vision and other trauma and injuries resulting from the Helicopter Crash, was highly agitated when Frank presented him with the Sworn Statement as revised by Marks and his office, repeatedly referencing the fact that the Investigator had threatened him the prior day, and he stated he did not want to even look at the Statement.

121.    Pearce calmed down after being cajoled by Frank, and he reluctantly read the revised Sworn Statement, indicating he still needed some additional changes. Those changes,

which upon information and belief were minor, were marked on the copy provided to Pearce, and either Jason Sweeney or one of the office assistants at the Valdez residence effected those changes and tendered the further revised Sworn Statement back to Frank for purposes of getting Pearce to sign it.

122.    Frank then brought the revised Statement to Pearce, who was waiting for him in the Gazebo at the Valdez residence.

123.    Frank left the Statement with Pearce after reiterating the inducements related to him by Krys and Marks that would be extended to Pearce, but he did not see Pearce sign that revised Statement.   Nonetheless, the Statement as signed by Pearce was thereafter left on Sweeney's desk, who, in turn, transmitted it to Marks.

124.    Pearce denies ever signing the Statement; however, the signature thereon bears a remarkable resemblance to Marks' signature.

### G.  Continued Efforts to Induce Daria to Retain Defendants; No Disclosure of Pearce Claim  That Soffer Was Piloting Helicopter; Failure to Disclose Conflicts of Interest

125.    During Marks' initial meeting with Daria on November 29, 2012, following his return from Pearce's apartment, with Sweeney also present, Marks told Daria that his firm had represented Soffer family-owned businesses in aviation matters for more than 20 years.

126.    Again withholding his knowledge that Pearce had advised his Investigator that Soffer, not Pearce, was flying the Helicopter at the time of the Crash, and in furtherance of the Conspiracy, Marks repeatedly, and disingenuously, emphasized how lucky Daria was that her friends, Soffer and the Riordans, had told him that they had agreed to channel all available insurance proceeds to Daria and the Minor Children, while waiving any claim to receive any of those insurance proceeds.

127.    Most particularly, in seeking to induce Daria to retain him and the Podhurst Firm, Marks reiterated his prior entreaty made initially to Sweeney and Frank on the telephone and again at the Valdez residence, to the affect that if he was retained by Daria, Soffer would make available the proceeds from several other insurance policies he and/or his companies maintained, which would greatly increase the Valdez family's monetary recovery.

128.    At this time, Sweeney, having previously been lured by the promise of the availability of additional insurance policies, made further specific inquiry on this point; and, as a result, Marks confirmed that there were "several additional policies that would be available."  Of course, no such additional insurance policies or proceeds ever materialized, beyond those available through the insurance carrier on the Helicopter.

129.    In the course of these initial discussions by, between and among each of Daria, Frank Valdez, Jason Sweeney and Marks, Daria and Frank each raised the issue (as was discerned from their visit with Pearce while he was still in Doctors Hospital on November 23, 2012), as to what might be the impact on any recovery if it turned out that Soffer, and not Pearce, was piloting the Helicopter at the time of the Crash.

130.    In response, and in furtherance of the Conspiracy, and to instill a misperception in the mind and eye of Daria, Marks assured Daria, without any due diligence investigation, that Soffer  was not piloting the Helicopter at the time of the Crash; and further stated that even if it turned out that Soffer was flying the Helicopter at the time of the Helicopter Crash, "it would not matter" and "would make no difference" because Pearce was nonetheless the "Pilot in Command."

131.    This response to the specific inquiry regarding the ramifications about the possibility that Soffer was piloting the Helicopter was not clear, and was intended to misdirect Daria, in that it was given without more broadly explaining that the term "Pilot in Command"

was a term of art used in aviation parlance to indicate an entitlement to insurance coverage (here limited to $2 million).

132.    Marks never explained to Daria, in writing or otherwise, that Soffer would, or could also and separately be liable in damages the Plaintiffs exceeding $150 million, or more, if it was found that Soffer was actually in control of and flying of the Helicopter at the time of the Crash.

133.    Compounding the advancement and promotion of the Conspiracy, Marks neither disclosed to Daria Pastoukhova the information that he had gleaned from his Investigator that Pearce claimed that Soffer was piloting the Helicopter, nor did he disclose in writing, or otherwise, the various conflicts of interest that existed in concurrently representing Soffer, the Riordans and the Plaintiffs, especially in circumstances where Marks knew, or had a basis to believe that Pearce had then already insisted that Soffer was flying the Helicopter at the time of the Crash; irrespective of any notations to the contrary in the putative Sworn Statement.

134.    Not only did Marks fail to provide Daria with a written iteration and  detailed description and explanation of his and his Firm's disabling conflicts in soliciting Daria's retainer and engagement of Marks and his Firm in the circumstance that he and the Podhurst Firm had already been retained by Soffer and the Riordans, he also never solicited nor obtained any written waiver from Daria on "informed consent"  as to the underlying conflicts of interest and the concomitant appearances of impropriety  resulting from his firm's longstanding relationship with the Soffer family and Turnberry businesses.

135.    In this connection it is submitted that there were patently obvious conflicting interests – between Soffer and the Riordans on the one hand, and Daria Pastoukhova and the Minor Children and Valdez Estate on the other--arising from the Helicopter Crash and the prospect that Soffer, not Pearce, may have been in control at the time of the Crash; and Marks

and the Podhurst Firm were proscribed from soliciting and/or accepting Daria's retention absent obtaining her "informed consent" in a writing.

136.    These failures of full and complete explanation and disclosure and written waiver thereof were  unequivocally required under Florida Bar Rule 4-1.7, and the failure to make such disclosures in writing and the failure to obtain Daria's waiver in writing and on "informed consent"  vitiates any ensuing advice of counsel and representation of Plaintiffs by Marks and the Podhurst Firm, on which Plaintiffs were entitled to rely; and, in turn, vitiates the viability and enforceability of the Release as it relates to Soffer and the Riordans, and/or as it might be claimed as a defense to any suit by Plaintiffs against Soffer.

137.    In the context of the foregoing, it was not until on or about December 5, 2012, in pursuance of continuing importunities and overtures, that Daria Pastoukhova retained the Podhurst Firm.

138.    Neither at any of the times referred to above, nor at any time before or after this retention and engagement did Marks, or the Podhurst Firm, make any written disclosures or other explanation of these disabling conflicts of interest, and neither did they  proffer or obtain any written waiver thereof. This is because to do so would have inhibited the pursuance and/or accomplishment of the purposes of the Conspiracy.

139.    On information and belief, at or before the time and date that Marks and the Podhurst Firm were retained by Plaintiffs as their counsel, they had already agreed to also represent each of Soffer and the Riordans as their attorneys in connection with the Helicopter Crash; and in pursuance of that retention and for the benefit of Soffer, they interviewed and sought to coerce Pearce to sign the Sworn Statement, as revised.

140.    On December 10, 2012, Marks, purporting to act for and on behalf of each of Plaintiffs, Soffer and the Riordans, made a written demand on the Insurance Carrier's claims representative, in his capacity as an agent for the Insurance Carrier, demanding that the Insurance Carrier pay the single combined policy limit on the Helicopter of $2 million.

141.    Among other things, in making this demand, Marks' stated in his writing of December 10, 2012, as follows:

> I have been retained to represent everyone on board [the Helicopter] with the exception of David Pearce, the Pilot. …Since I represent all of the occupants, there can be no claim that a tender is not possible given the existence of other claimants. Furthermore, you do not need to be concerned with the allocation of the policy limits since that will be my responsibility.

142.    In making his demand, Marks gave the insurance carrier 30 days to pay the policy limits to the Podhurst Firm's Trust Account.

143.    Notably, this demand was made by Marks with great alacrity, and without any prior or sufficient due diligence investigation of the actual facts and circumstances relating to the Helicopter Crash, and with the full knowledge and understanding, or without regard to the fact that Soffer was, or was rumored to be, piloting the Helicopter at the time of the Helicopter Crash; and, even more demonstratively, without regard to the fact that Marks knew, or had a reasonable basis to initiate an investigation to learn and find out if Pearce or Soffer was piloting the Helicopter at the time of the Crash.

144.    Instead of initiating and pursuing an investigation of this essential and material fact as to who was actually piloting the Helicopter, Marks, in derogation of his and the Podhurst Firm's fiduciary duty to Plaintiffs, blindly accepted Soffer's insistence that he was not piloting the Helicopter as the time of the Crash, or alternatively, knew, or had reason to know, that Soffer was piloting the Helicopter, but none the less made the foregoing written demand on the

Insurance Carrier, and such demand was for the benefit and interest of Soffer, but not in the best interests of Plaintiffs.

145.    Moreover, at the same time he was prosecuting his demand that Harry Cibak, attorney for the Insurance Carrier, tender the full policy limit of $2 million, he was advising Jason Sweeney, as an officer and representative of the entity that owned the Helicopter, Pioneer Caribbean Logistics Limited ("Pioneer"), to withhold from arranging for a meeting between the Insurance Carrier's agents and Pearce for purposes of allowing the Insurance Carrier's agent to obtain a statement from Pearce with respect to the Helicopter Crash.

146.    In one iteration of the Podhurst Retainer, Marks included the representation that the Podhurst Firm would also prosecute a claim in respect to the Hull for free. Not only was this a knowing conflict of interest, but it allowed Marks to take control of the entirety of the legal claims—thus enabling him to more effectively advance the Conspiracy.

147.    In furtherance of an actual and intended, or unwitting, effort to advance the Conspiracy after the Marks' Demand Letter was transmitted to Harry Cibak, Marks also urged Sweeney, in his capacity as a representative of Pioneer, to implore the Insurance Carrier to pay the maximum limit of the $2 million policy--while concomitantly instructing Sweeney not to do anything else, until after Marks heard that the $2 million had been paid to the Podhurst Firm's trust account.

148.    Accordingly, upon the direct advice of Marks, Sweeney, in his capacity as a representative of Pioneer, did not fully respond to various requests made by representatives of the Insurance Carrier for supplemental information, and refrained from assisting the representatives of Insurance Carrier in their attempt to interview Pearce.

149.    The foregoing actions by Marks, among others, were in furtherance of an actual and intended or unwitting effort to advance and implement the Conspiracy.

150.    After Daria and Sweeney received the proposed Podhurst Written Retainer for review on or about November 29, 2012, they noticed that there was only a place for Daria Pastoukhova's signature, although Marks had advised them both that the Podhurst Firm was being and/or had already been retained by Soffer and the Riordans.

151.    When Daria and Sweeney made inquiry to Marks regarding this apparent anomaly, Marks told them that Soffer and the Riordans did not have to sign any Retainer because they had agreed to waive any damages and had agreed to allow Daria and the Minor Children to receive and enjoy all of the insurance proceeds related to the Helicopter Crash.

152.    Dispelling any confusion or putative inconsistent claims by Marks however, when Marks transmitted his Demand to the Insurance Carrier's claims representative on or about December 10, 2012, he clearly stated that he represented all of the passengers on the Helicopter, except for Pearce.

153.    In response to her inquiries, Marks also told Daria that each of Soffer and the Riordans had expressly stated that Pearce was flying and was in control of the Helicopter at the time of the Crash.

154.    Imbued with the knowledge that Pearce had emphatically claimed and declared that Soffer was flying the Helicopter, Marks and the Podhurst Firm were required to: (a) conduct a detailed investigation of the underlying facts; and (b) disclose to the Plaintiffs what Pearce stated to Mark's' Investigator regarding Soffer's control of the Helicopter before Marks and the Podhurst Firm could take on the concurrent multi-party representation of Soffer and the Riordans as their clients in conflict with the interests of Plaintiffs; and before they could craft and urge the execution and implement the Release between the parties.

29

155.    At no time did Marks advise Daria Pastoukhova in writing, or otherwise, that if a due diligence or other investigation of the underlying facts revealed that Soffer was flying the Helicopter, she, the Minor Children and the Valdez Estate might recover exponentially greater damages from Soffer, as compared to accepting the limited and relatively paltry sum of $2 million in insurance proceeds in consideration of executing the Release, releasing Soffer from any liability he might otherwise have.

156.    Additionally, to induce her agreement to retain Marks and the Podhurst Firm, Marks advised Daria that it was in her best interests to work with him, Soffer and the Riordans to pursue the insurance company immediately, including because he had excellent connections and contacts with those insurance companies and had demonstrated large recoveries against almost all of the insurance carriers in this area.

157.    Nonetheless, Marks, Soffer and the Riordans individually, and/or collectively, including through Krys, in furtherance of the Conspiracy implored Daria and Sweeney to act quickly and not to delay in retaining Marks and the Podhurst Firm, declaring that any delay might bar a recovery.

158.    In his dealings with Daria and Sweeney, Marks' sense of urgency was palpable and unmistakable; and in his persistent efforts, he was wittingly or unwittingly tied to and in the position of promoting the underlying Conspiracy, since he was not, or should not have been, unmindful that a full due diligence investigation of the actual underlying facts might unmask the truth that Soffer was flying the Helicopter at the time of the Crash.

## CONDITIONS PRECEDENT

159.    All conditions precedent to bringing this action have been performed or waived.

## COUNT I
## LEGAL MALPRACTICE

160.     Plaintiffs hereby incorporate Facts Common to All Counts, as if herein set forth.

161.     The duty of care and the necessity for full and fair representation and advice took effect as of November 29th, when Marks implored his retention and began to give Daria advice. At this time, Marks was also under the duty to reveal all potential conflicts of interests between his representations.

162.     At all times herein, Defendants owed a duty of care to Plaintiffs to represent them in legal advice, communications, and guidance in accordance with the relevant legal standards of care within the practice of law.

163.     Defendants breached this relevant duty of care by failing to adequately represent Plaintiffs in providing competent legal advice, full and accurate communications, and legal advice in accordance with relevant legal standards within the practice of law, as more detailed below.

164.     Specifically, Defendants, inter alia, recommended urged and implored Plaintiffs to enter into a Release that Defendants knew, or should have known was not in Plaintiffs' best interests without a full and due diligence investigation of the underlying facts.

### A.  Violation of Florida Bar Rule 4-1.18

### Duties to Prospective Client

165.     Florida Bar Rule 4-1.18 provides the following:

    a. **Prospective Client.** A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.

    b. **Confidentiality of Information.** Even when no client-lawyer relationship ensues, a lawyer who has had discussions with a prospective client shall not

use or reveal information learned in the consultation, except as rule 4-1.9 would permit with respect to information of a former client.

c.  **Subsequent Representation.** A lawyer subject to subdivision (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be used to the disadvantage of that person in the matter, except as provided in subdivision (d). If a lawyer is disqualified from representation under this rule, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in subdivision (d).

d.  **Permissible Representation.** When the lawyer has received disqualifying information as defined in subdivision (c), representation is permissible if:

    (1)  both the affected client and the prospective client have given informed consent, confirmed in writing; or

    (2)  the lawyer who received the information took reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary to determine whether to represent the prospective client; and

        i.  the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and

        ii.  written notice is promptly given to the prospective client.

166.  Marks and the Podhurst Firm violated Florida Bar Rule 4-1.18 by failing to promptly inform and communicate to Daria their conflict of interest in representation while still in the prospective client phase.

167.  Marks and the Podhurst Firm failed to properly explain that they were also representing Jeffrey Soffer and the Riordans, whose interests were in direct conflict with Plaintiffs'; and failed to disclose and explain the consequences of such conflicts.

168.  Marks and the Podhurst Firm were aware of this conflict prior to their official representation of Plaintiffs, but still failed to properly communicate and inform Plaintiffs of their conflict.

169.  Marks and the Podhurst Firm failed to take steps to properly disclose the conflict.

170.  Therefore Marks and the Podhurst Firm violated their ethical responsibilities to the Plaintiffs.

## B.  Violation of Florida Bar Rule 4-1.7

### Failure to Disclose Conflicts

171.    Florida Bar Rule 4-1.7 provides the following:

    a.  **Representing Adverse Interests.** Except as provided in subdivision (b), a lawyer must not represent a client if:

        (1)  the representation of 1 client will be directly adverse to another client; or

        (2)  there is a substantial risk that the representation of 1 or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

    b.  **Informed Consent.** Notwithstanding the existence of a conflict of interest under subdivision (a), a lawyer may represent a client if:

        (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

        (2) the representation is not prohibited by law;

        (3) the representation does not involve the assertion of a position adverse to another client when the lawyer represents both clients in the same proceeding before a tribunal; and

        (4) each affected client gives informed consent, confirmed in writing or clearly stated on the record at a hearing

    c.  **Explanation to Clients.** When representation of multiple clients in a single matter is undertaken, the consultation must include an explanation of the implications of the common representation and the advantages and risks involved.

172.    Marks and the Podhurst Firm had a conflict of interest in violation of Florida Rule 4-1.7.

173.    They were aware of this conflict both at the time Plaintiffs were prospective clients, when they were already offering legal advice, and at the time they began formal representation of Plaintiffs.

174.    Defendants made no written disclosure (and failed to fully and completely provide written explanations of the consequences) of the conflicts of interest pertaining to the multi-party representation of each and all of Soffer, the Riordans and Plaintiffs, and did not

provide any written waiver of the conflicts on an informed basis, relating to the multi-party representation by Marks and the Podhurst Firm; and said Defendants failed to urge and implore Plaintiffs to consult with independent counsel in respect of any conflicts of interest.

175.     Such multi-party representation was not only a violation of the ethical standards and rules of the legal profession, but a material breach of the contract between Podhurst Orseck P.A. and Daria Pastoukhova.

176.     Defendants knew and were aware that such multi-party representation was a breach of the contract between Defendants and Daria.

177.     Had Daria been aware of the underlying and disabling conflicts of interest on the part of Defendants, and had the consequences and prospects of such conflicts been explained to her, she would have obtained the advice of independent legal counsel at the outset, and would not have retained Defendants.

178.     Upon information and belief, Defendants purposefully withheld from making the requisite disclosures required under Florida Bar Rules 4-1.4 and 4-1.7 because such disclosure would make the retention of the Defendants exponentially less likely, or completely unlikely, and would have therefore frustrated or defeated the purposes of the Conspiracy.

179.     Defendants also made materially false statements, and/or omitted to state material facts which were necessary of disclosure so as to make the foregoing statements true under the circumstances in which they were made, with the intent to persuade and induce Daria into signing the Release, which released Soffer and the Riordans, Defendants' other clients, from any and all liability.

180.     Such false statements were a material breach of the contract between Defendants and Daria; and otherwise constituted a material act of malpractice in the Florida Community in which Defendants practice law.

181.   Had Daria known of the falsity of the statements made by the Defendants, and if she had been fully informed about such representations, Daria would not have signed the Release.

182.   As a result of Defendants non-disclosure and failures of explanation, Plaintiffs were not and did not become fully informed, and they could not provide any "informed consent" to such breaches of fiduciary duty.

### C.  Violation of Florida Bar Rule 4-1.4:

### Duty of Communication

183.   Florida Bar Rule 4-1.4 provides the following:

    **a.**  Informing Client of Status of Representation. A lawyer shall:

        (1)  promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in terminology, is required by these rules;

        (2)  reasonably consult with the client about the means by which the client's objectives are to be accomplished;

        (3)  keep the client reasonably informed about the status of the matter;

        (4)  promptly comply with reasonable requests for information; and

        (5)  consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows or reasonably should know that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

    **b.**  Duty to Explain Matters to Client. A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

184.    Marks and Podhurst violated Florida Bar Rule 4-1.4 by failing to promptly inform and communicate to Daria their conflict of interest in representation.

185.    Marks and Podhurst failed to properly explain that they were also representing Soffer and the Riordans, whose interests were in direct conflict with Plaintiffs'.

186.    Marks and Podhurst were aware of this conflict at the time they began representation of Plaintiffs but still failed to properly communicate and inform Plaintiffs of their conflict.

187.    Marks and Podhurst failed to take steps to properly disclose the conflict, and this violated their ethical responsibilities to the clients.

188.    Defendants made no disclosure of the conflicts of interest pertaining to the dual representation, and Daria was not asked to provide, and did not provide, any written waiver of the dual representation by Marks and the Podhurst Firm.

189.    Instead, Defendants encouraged, recommended and induced Plaintiffs to enter into the Release by making false and fraudulent misrepresentations, and/or by failing to make due investigation of the truth of the underlying facts and circumstances, all the while knowing, and/or having a reasonable basis to suspect that such misrepresentations were false; and/or by concomitantly recklessly failing to investigate the underlying facts and circumstances of the Helicopter Crash.

190.    Defendants knew or had reason to know, that their false and fraudulent misrepresentations, and their less than full and fair advice would directly induce Plaintiffs into executing the Release.

191.    Upon information and belief, while Defendants advised Plaintiffs that Defendants Marks and the Podhurst Firm had previously represented the interests of Jeffrey Soffer and/or companies in which his family had substantial interest, they failed to advise them that such prior representations had generated millions of dollars in fees to such attorneys, and that this fact would have a disabling impact on the firm's ability to comply with the relevant legal standards of care within the practice of law in Florida.

192.    Defendants wholly and abjectly failed to meet all of these duties discussed herein, thereby violating the relevant legal standards of care within the practice of law.

193.    As a direct and proximate result, the Plaintiffs have suffered damages, to wit; had Plaintiffs been advised in good faith, they would not have retained Marks and the Podhurst Firm, they would not have release Soffer from liability, and would have been entitled to pursue a wrongful death action against Soffer and obtained a monetary recovery many magnitudes greater than the $2 million advised by Marks.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT II
## BREACH OF FIDUCIARY DUTIES

194.    Plaintiffs hereby incorporate all Facts Common to All Counts, as if set forth herein.

195.    Defendants, acting as attorneys for Plaintiffs, owed Plaintiffs a fiduciary duty to preserve and protect Plaintiffs' interests, rights, and opportunities.

196.    On information and belief, at or before the time and date that Marks and the Podhurst Firm were retained by Plaintiffs as their counsel, they had already agreed to also represent each of Soffer and the Riordans as their attorneys in connection with the Helicopter Crash.

197.    Also prior to being retained by Plaintiffs, Marks either had full knowledge and understanding, or acted without regard to the fact that Soffer was, or was rumored to be, piloting the Helicopter at the time of the Helicopter Crash.

198.    Marks had a duty, even if he had obtained informed consent regarding the conflict described *supra*, which he did not, based on this knowledge, to initiate an investigation to learn and find out if Pearce or Soffer was piloting the Helicopter at the time of the Crash so that he could ascertain the best course of action for Plaintiffs. Marks and the Podhurst Firm were required to: (a) conduct a detailed investigation of the underlying facts; and (b) disclose to the Plaintiffs what Pearce stated to Marks' Investigator regarding Soffer's control of the Helicopter; and (c) outline potential courses of action.

199.    Instead of initiating and pursuing an investigation in derogation of his and the Podhurst Firm's fiduciary duty to Plaintiffs, Marks blindly accepted Soffer's insistence that he was not piloting the Helicopter as the time of the Crash, or alternatively, knew, or had reason to know, that Soffer was piloting the Helicopter. Instead, when responding to Daria's inquiries, Marks told Daria that each of Soffer and the Riordans had expressly stated that Pearce was flying and was in control of the Helicopter at the time of the Crash.

200.    Once retained, Marks then made the foregoing written demand on the Insurance Carrier, and such demand was for the benefit and interest of Soffer, but not in the best interests of Plaintiffs.

201.    At no time did Marks advise Daria Pastoukhova in writing, or otherwise, that if a due diligence or other investigation of the underlying facts revealed that Soffer was flying the Helicopter, she, the Minor Children and the Valdez Estate might recover exponentially greater damages from Soffer, as compared to accepting the limited and relatively paltry sum of $2 million in insurance proceeds in consideration of executing the Release, releasing Soffer from any liability he might otherwise have.

202.    Defendants, by virtue of the actions, omissions, and failures to act as described above, breached said fiduciary duties.

203.    As an actual and proximate result of Defendants' breach of fiduciary duties described above, Plaintiffs have been injured in an amount to be proven at trial.

204.    In breaching said fiduciary duties, Defendants acted with oppression, fraud, and/or malice and wrongfully engaged and participated in the Conspiracy.

205.    As a direct and proximate result of Defendants' acts, Plaintiffs suffered damages, to wit; had Plaintiffs been advised in good faith, they would not have released Soffer from liability, and would have been entitled to pursue a wrongful death action against Soffer and obtained a monetary recovery many magnitudes greater than the $2 million advised by Marks.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT III
## INTENTIONAL AND NEGLIGENT MISREPRESENTATIONS

206.    Plaintiffs hereby incorporate all Facts Common to All Counts, as if herein set forth.

207.    The actions and representations herein described above were made intentionally, recklessly, with gross negligence, and/or negligently.

208.    The actions and representations described in Facts Common to All Counts were material.

209.    The representations described above were reasonably relied on by the Plaintiffs, directly causing Plaintiffs to enter into the Release.

210.    The reliance by Plaintiffs actually and proximately caused Plaintiffs damages in an amount to be proven at trial, but no less than the amount of money, time, and effort spent on

retaining new counsel, as well as the cognizable emotional distress Defendants' actions, namely their intentional and negligent misrepresentations, caused the Plaintiffs.

211.    In performing the acts and omissions as described herein above, Defendants acted with oppression, fraud and/or malice.

212.    As a direct and proximate result of Defendants' acts, Plaintiffs suffered damages, to wit; had Plaintiffs been advised in good faith, they would not have released Soffer from liability, and would have been entitled to pursue a wrongful death action against Soffer and obtained a monetary recovery many magnitudes greater than the $2 million advised by Marks.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT IV
## INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

213.    Plaintiffs hereby incorporate all Facts Common to All Counts, as if herein set forth.

214.    Defendants' actions described in the Facts Common to All Counts: the failure to disclose that Soffer was piloting the Helicopter and may be at fault, the failure to disclose Defendants' longstanding relationship to Soffer, the failure to disclose the conflict of interest, the failure to diligently investigate the matter, accompanied by the pressure put upon a widow dealing with the tragic and untimely death of her spouse and father of three young children to execute a release that in effect would preclude action against Jeffrey Soffer, were intentional and/or negligent.

40

215.    Such conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.

216.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered severe emotional distress, and have been and will be greatly inconvenienced in their ability to lead and enjoy a normal life, have lost and will continue to lose substantial income, and have lost  monies spent in retaining new counsel.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT V
## FRAUDULENT MISREPRESENTATION

217.    Plaintiffs hereby incorporate Facts Common to All Counts, as if herein set forth.

218.    Despite their knowledge that Mr. Soffer was actually piloting the aircraft, Defendants continued to falsely and fraudulently and/or intentionally, or with reckless disregard to their duty of investigation, misrepresent that it was David Pearce that was behind the controls of the Helicopter at the time of the Crash.

219.    Defendants knew that if Plaintiffs knew and were aware that it was not Soffer who was piloting the Helicopter at the time of the Crash, Plaintiffs would not sign or enter into the Release, which severely limited Plaintiffs ability to collect monies from and bring suit against Soffer.

220.    Despite this knowledge, Defendants continued to misrepresent to the Plaintiffs that it was David Pearce at the Helicopter controls at the time of the accident, and not Mr. Soffer.

221.    Alternatively, Defendants knew that there was a substantial basis to believe that Soffer was piloting the Helicopter at the time of the Crash, and willfully and/or recklessly withheld from and did not pursue any due diligence investigation of the underlying facts.

222.    Despite this knowledge, Defendants continued to affirmatively misrepresent to Plaintiffs, directly and/or indirectly, that entering into the Release was in the best interest of the Plaintiffs.

223.    The actions and representations described above were material, and Plaintiffs reasonably relied thereon; including and especially the advice of Plaintiffs' counsel, Defendants, Marks and the Podhurst Firm.

224.    Defendants made these misrepresentations with the knowledge that these representations would induce Plaintiffs to enter into the Release.

225.    Defendants' misrepresentations did indeed induce Plaintiffs to enter into the Release.

226.    Defendants' fraudulent misrepresentations actually and proximately caused Plaintiffs to enter into the Release, thereby damaging the Plaintiffs.

227.    The representations, actions and omissions described above were reasonably relied on by the Plaintiffs, directly causing Plaintiffs to enter into the Release.

228.    Said reliance by Plaintiffs actually and proximately caused Plaintiffs damages in an amount to be proven at trial, as well as the cognizable emotional distress Defendants' actions caused the Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT VI
## FRAUDULENT INDUCEMENT

229.     Plaintiffs hereby incorporate all previous paragraphs, as if herein set forth.

230.     Soffer was flying the Helicopter at the time of the Crash, and was and remains responsible for the Crash that killed Lance Valdez.

231.     Defendants Marks and the Podhurst Firm were aware and had knowledge that it was Soffer who was flying the Helicopter at the time of the crash; or alternatively, they had a reasonable basis to believe that there were facts and circumstances that could, or would, be discovered by a good faith and due diligence investigation.

232.     Despite this knowledge, Defendants continued to represent to Plaintiffs that it was David Pearce who was flying the Helicopter at the time of the Crash without undertaking and/or pursuing any such good faith and/or due diligence investigation thereof.

233.     Defendants continually lied and misrepresented to Plaintiffs that it was David Pearce at the helicopter controls, in an effort to further and advance the purposes of the Conspiracy, and more specifically to wrongfully and fraudulently persuade Daria to pursue an insurance recovery, rather than a claim or litigation against Soffer.

234.     More specifically, Defendants, acting in concert with  Soffer, the Riordans, Krys and one or more others, engaged in fraudulent conduct, including making statements with the knowledge of falsity, to Daria to persuade her to sign the Release, which would release Mr. Soffer and the Riordans from all liability.

235.     Defendants acted purposefully in making the false and fraudulent statements to Plaintiffs.

236.     Defendants, by their respective failure of full and fair disclosure, and by their intentionally deceptive and/or coercive statements and conducts, and by their participation in the

Conspiracy did indeed persuade and induce Daria to sign the Release based on information that was knowingly false.

237.    Defendants knew that the facts, circumstances and impression they created that David Pearce was flying the Helicopter at the time of the crash were untrue and misleading; or they had reasonable basis to know such facts and circumstances, but willfully failed and refused to investigate the underlying facts.

238.    The foregoing conduct was performed in an effort to assist Soffer to avoid any personal liability as to Soffer and the Riordans.

239.    Despite their retention as legal counsel for the Plaintiffs and despite their duty of care owed to the Plaintiffs, Defendants allowed Daria to be misled and actively engaged in the conduct of the Conspiracy, which purposefully hid, or distorted the truth.

240.    Defendants had knowledge of special facts not readily available to the Plaintiffs, and such silence and/or continued misrepresentation was fraudulent in the circumstances where Defendants knew, or should have known, that Daria was acting individually, and as the representative for her Children, and was operating upon a mistaken belief as to the material fact as to who was piloting and in control of the Helicopter at the time of the Crash, and who was ultimately responsible for the death of her husband.

241.    Daria was unaware, and could not have known, that the statements regarding who was behind the controls of the Helicopter at the time of the Crash were false; or alternatively, she relied on the affirmative representations and advice of her counsel that it did not matter because not matter and was of no significance since Pearce was the "Pilot in Command" which was sufficient to satisfy any requirements to collect and/or lay claim to the insurance proceeds; and said Defendants' knew, or should have known that their advice to Daria was misinterpreted and/or misunderstood by Plaintiffs in the absence of any full and fair disclosure and explanation.

242.     In reliance upon and as a result of Defendants' misrepresentations and lies, Daria signed the Release.

243.     Had Defendants been truthful, and/or made full and fair disclosure of the underlying material facts and circumstances, Daria would not have signed the Release.

244.     Said reliance by Plaintiffs actually and proximately caused Plaintiffs damages in an amount to be proven at trial, as well as the cognizable emotional distress Defendants' actions caused the Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT VII
## CIVIL CONSPIRACY

245.     Plaintiffs hereby incorporate all Facts Common to All Counts, as if herein set forth.

246.     Defendants were aware and had the knowledge that it was Mr. Soffer who was piloting the aircraft at the time of the crash.

247.     Defendants were aware and had the knowledge that because Soffer was piloting the Helicopter at the time of the Crash, Mr. Soffer would be personally liable for all damages, including the death of Mr. Lance Valdez.

248.     Defendants had a direct or indirect professional relationship with Soffer which had to be fully disclosed and explained to Plaintiffs, including all consequences thereof, but it was not.

249.    Instead of disclosing these facts and relationships to the Plaintiffs, Defendants entered into a Conspiracy with Soffer, the Riordans, and Krys, and one or more others with the ultimate purpose of inducing Plaintiffs to execute and deliver the Release, thereby purporting to absolve Soffer of any personal liability.

250.    Specifically, Defendants entered into the Conspiracy with Soffer, the Riordans, and Krys to fraudulently, intentionally and negligently induce Plaintiffs into believing that Soffer was not piloting the helicopter at the time of the Crash.

251.    Defendants knew that Soffer, the Riordans and Krys had previously lied and deceived Plaintiffs on numerous occasions into believing that Soffer was not piloting the Helicopter at the time of the Crash.

252.    Defendant Marks, together with Soffer, the Riordans, Craig Robbins, and Krys all conspired, directly or indirectly, and in various ways, to induce Daria to retain Defendants Marks and the Podhurst Firm to execute a "Retainer for legal services", and to provide legal representation in pursuance of that Retainer, as described herein.

253.    Further, Defendants Marks and the Podhurst Firm together with Soffer, the Riordans, Krys, and one or more others, conspired and otherwise acted in a way that was intended to conceal from Ms. Pastoukhova, and others acting on her behalf, the fact that Soffer, not Pearce, was flying the Helicopter at the time of the Helicopter Crash, and that Soffer's negligence was primarily, if not solely, responsible for the death of Lance Valdez.

254.    It was a key element and intent of the underlying conspiracy to focus the Plaintiffs' attention on pursuing and obtaining the recovery of certain insurance proceeds, rather than to pursue an investigation of the facts relating to the Crash and the wrongful death of Lance Valdez, and to induce Plaintiffs to refrain from pursuing other actions and/or claims against any person(s) who might have been responsible and liable in any manner for the death of Lance

Valdez--for the ultimate purpose of encouraging and inducing Daria Pastoukhova to issue a full and general release in favor of Soffer, the Riordans and others from liability for, or with respect to, the death of Lance Valdez (the "Conspiracy").

255.    As further detailed below, Defendants Marks and the Podhurst Firm were aware, or should have been aware, that it was, and/or might likely have been Soffer, not Pearce, who was piloting the Helicopter at the time of the Crash, and/or each of such Defendants had a good and a reasonable basis to have made an energetic and due diligence investigation of those facts, but they failed to do so.

256.    Upon information and belief, this subterfuge, deception, and the resulting Conspiracy was necessary because if it was discovered that Soffer was piloting the Helicopter without a valid license, he would be personally liable and responsible to the Plaintiffs for the death of Lance Valdez—most likely without any insurance coverage being available to pay such personal liabilities.

257.    Despite the Defendants' knowledge and the Defendants' duty to disclose the true facts to their clients, Defendants acted in concert with Soffer, the Riordans, and Krys in inducing the Plaintiffs to enter into a Release which Defendants knew did not protect, and which was adverse to Plaintiffs' rights, interests and entitlements.

258.    As a direct and proximate result of these fraudulent acts, the Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT VIII
## BREACH OF CONTRACT

259.   Plaintiffs hereby incorporate all Facts Common to All Counts, as if herein set forth.

260.   On or about December 5, 2012, Daria Pastoukhova retained the Podhurst Firm, and specifically, lawyer Steven C. Marks of that Firm, as legal counsel in connection with the Crash.

261.   Said retainer was a legal, valid, binding contract between Defendants and Daria for legal services.

262.   On information and belief, at or before that time, Marks and the Podhurst Firm had agreed to also represent each of Soffer and the Riordans in connection with the Helicopter Crash.

263.   Defendants made no disclosure of the conflicts of interest pertaining to the multi-party representation of Soffer, the Riordans and Plaintiffs, and Daria was not asked to provide and did not provide any written waiver of the conflicts pertaining to and precluding the multiparty representation by Marks and the Podhurst Firm absent a writing issued by Plaintiffs based on informed consent.

264.   Such multi party representation was not only a violation of the ethical standards and rules of the legal profession, but a material breach of the contract between Podhurst Orseck and Daria Pastoukhova.

265.   Defendants knew and were aware that such dual representation without her informed consent was a breach of the contract between Defendants and Daria.

266.   Had Daria been aware of the dual representation, she would have obtained other legal counsel.

267.     Defendants also made materially false statements with the intent to persuade and induce Daria into signing the Release, which released Soffer and the Riordans, Defendants' other clients, from any and all liability.

268.     Such false statements were a material breach of the contract between Defendants and Daria.

269.     Had Daria known of the falsity of the statements made by the Defendants, Daria would not have signed the Release.

270.     As a direct and proximate result of these fraudulent acts, the Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.


## DAMAGES

1.     $100 million dollars on each Count set forth above;

2.     Disgorgement of all legal fees obtained by the Defendants as a result of the legal malpractice, breach of ethical duties and fraud;

3.     Punitive and exemplary damages on each Count set forth above;

4.     Any and all other relief this Court deems just.


## JURY DEMAND

Plaintiffs demand trial by jury on all counts so triable as of right.

Dated this 11th day of November, 2014.

s/ Louise R. Caro, Esq.
Louise R. Caro, Esq.
LAW OFFICES OF NAPOLI BERN RIPKA
SHKOLNIK, LLP
2665 S. Bayshore Drive, Suite 220
Coconut Grove, Florida 33133
Tel: (786) 837-5442
Email: lcaro@napolibern.com
Florida Bar Number 0633380

Hunter J. Shkolnik, Esq. (*pro hac vice* pending)
NAPOLI BERN RIPKA SHKOLNIK, LLP
Empire State Building
350 Fifth Avenue, Suite 7413
New York, New York 10118
Tel: (212) 267-37003
Email: hunter@napolibern.com